The next matter is In Re or In the Matter of NIR. Good morning, Mr. Andrus. May it please the Court, good morning. My name is Brent Andrus. I'm here on behalf of Petitioner Appellant Mohaci Gabor. The child abduction provisions of the Hague Convention are meant to protect children and parents. Pronounce his name again and the way you did it, because it's not necessarily... I might have said it backwards, Mohaci Gabor, which is the Hungarian... Yes, I seem to remember from a Hungarian, Mohaci Gabor is the way they would do it. They do it... That's right. That's right. Yep. Thanks very much. The child abduction provisions of the Hague Convention are meant to protect the rights of children and parents, but they're also meant to protect the rule of law and to prevent forum shopping. In the instant case, we have not just a hypothetical threat of forum shopping, but we have an admitted attempt to avoid the ruling of a foreign court by secretly fleeing that country with a child in question before the court had a chance to rule and enforce its judgment. Do I understand the record correctly, and please correct my understanding if I don't, that in the Hungarian proceedings, I'll call them paternity proceedings, the mother indicated to the court early on in the process that it was her intent to leave Hungary with the child and come to the United States? That is not correct. The mother never said that to the court. She never said that to the police who she talked to. She never said that to anyone. She never posted it on Facebook. That was never uttered from her mouth. That is nowhere in the record. Let me ask you this, Mr. Hendricks. The wrongful retention claim, I understand, especially with the Supreme Court hearing certain issues relating to that, is a little more complicated. Are you referring to the Pagliari case? Yes. But wrongful removal, I just don't understand what your argument is on wrongful removal. It seems like even your expert conceded that under Hungarian law, your client had no parental rights before the paternity order, correct? Yes? Yes. Yes. Paternity order is not retroactive, correct? Correct. Custody rights are separate under Hungarian law from parental rights, that there's a separate agreement or court order that would have taken place? That's not exactly correct. Okay. Why don't you explain that to me, then? A parent, a natural parent in Hungary, would automatically have custody rights over their child. So if you are the natural parent— On page 422 and 423, your expert said the father would need to arrange for access to the child either by agreement or by court order. Is that not correct? After obtaining parental rights? If he was not the natural father, if he was not admitted as the natural father to begin with, that's true. That's what he would have to go through. Okay. But the bottom line is, again, correct me if I'm wrong, that at the time she left for the United States, there was no adjudication of any, forget about custody rights, but any parental rights by your client, right? Right. How could that be a wrongful removal? We admit that this is a unique case, and this is a case of first impression. But we believe that the purposes of the convention would be extremely frustrated if she is allowed to remove the child in this instance. Would it rule in your favor any time someone, even if they had no adjudicated rights by any court in a foreign country, that parent could not take the child out of the country, even though no one has made a determination if they're even the father or the mother of that child? I think there's unique circumstances in this case. Number one being he was the natural father, which she knew, but she lied about on purpose and left him off of the birth certificate. The second factor was that there was already an adjudication underway at which she appeared in Hungary and at which the child appeared represented by a trustee. In that circumstance, the adjudication was already underway to solve the question of paternity. And when that... That creates that type of issue. But here, we don't have a custody. This was not a custody proceeding. This was to determine whether or not he was the parent. But... That would be extending this to a level that I don't think any court has ever extended. That custody, that parental determination would have automatically granted him a custody right under Hungarian law. Yeah, but it would have been a disputed custody right. It would have... There would have been a dispute about how much custody each one of them would have been able to exercise, but he would have had... Not... Well, he would have had... Under Hungarian law, he would have had an exeunt right. He would have had a right to determine where the child lived. And that is the right under the convention as the Supreme Court and this court has held that matters for the convention. Let me... I just want to move to the defense regarding subjecting the grave risk of harm issue because if district court got that one right, that resolves the whole case, correct? If that defense applies. Right, right. If it does, yes. So, isn't it a fact that this court has said that prior spousal abuse, though not directed at a child, can support the grave risk of harm defense? Haven't we said that in the, I don't know how to pronounce it, Sautterger case? If, yes, if that abuse has a high likelihood of affecting the child. Right, so the district court credited Dr. Kling, concluding that there was a high likelihood both that your client's abuse of Ms. Herrera, if she and NIR returned to Hungary, that there was a high risk of abuse, and that NIR's development of a psychological disorder, should he witness such abuse, combined to create a grave risk of harm to NIR. That was Dr. Kling's conclusion, right? Yes. Which was credited by the district court. Yes. So, why should we... We believe, well, we believe that, first of all, the standard on this exception is higher than any other aspect of the Clarence-Kaminsky evidence. Number two, the court was erroneously relied on Dr. Kling's testimony. Number one, Dr. Kling never examined the appellant. And so, on what basis did she have to determine the likelihood that he was going to abuse the child? Well, the district court also found Ms. Herrera's own testimony regarding the abuse to be credible as well. So it wasn't just relying on doctor, on the doctor's finding with respect to the likelihood of abuse. The district court, the first three pages of the opinion outlines extensive abuse that the court found, right? The second thing that I would point out is that the appellant has two other children in Hungary, and there's no allegation of any abuse towards them. There's no allegation that he has abuse. That was addressed by the district court. The district court said that there's no evidence you're inclined to spend a lot of time with those children, first of all. That's, well... What, is that wrong? I think, yes, that is absolutely wrong. Yes. It's plain error? Yes. That's plain error. There was evidence of that, and I don't know where the court would have gotten that conclusion that he hadn't spent any time. So the credibility findings go out the window simply because there was no evidence of any type of abuse with regard to the other children? That's a determinative factor? I'm not saying it's a determinative factor, but it goes against the difficult standard, which the court already had, of finding this exception. It goes against meeting that clear and convincing evidence standard. The court has tested... And I would point out, the second thing that I would point out on the grave risk exception is that even if the court finds that there is a high likelihood of grave risk to the child, the court must examine whether ameliorative measures are possible to protect the child upon return. And in this case... The district court addressed that. He said that your client said he had a good relation with a police commander, that if there was a protective order, he'd be unlikely to abide by it. Apparently, he served 43 days in jail for resisting some type of, I don't know what it was, but he risked something and served 40-something days in jail, right? He had, long ago, there was a... He had 43 days of community service, is how... What I'm suggesting is the district court didn't forget to look at that issue. The district court specifically addressed the question of ameliorative measures and found that they did not exist. I would say that it was clear error in finding that he had a friend with the police department and that would, that eliminated the ability of the Hungarian... She testified she applied for a protective order in Hungary and could not get them. That is clear error. She applied for a protective order in Hungary, and the police were pursuing that and were working with her on that. The only reason that that was not, didn't come to fruition is that she fled the country in secret. And that record from the Hungarian police department is in, that's in the record, that statement. Around here, I don't know how much family law you do, but you apply for a protective order, you go in, you're going to get a temporary one almost automatically if you allege certain facts like spousal beatings and those sorts of things. There's no, we're working on it. I don't know exactly how it works in Hungary, but she had all the cooperation of the Hungarian police department. That they were capable of giving. Yes. All right. Which may be insufficient under the convention. Well, I don't think that the district court examined the Hungarian police department. No, I don't think he did. Structurally. It wasn't a basis for it, but if she goes in and says, I tried to get a protective order and I didn't get one, it is certainly not out of the realm of family law or the, you know, of anybody who practices family law or any family court judge or any judge who has participated in family court proceedings that you're not getting it when you ask for it, that's a problem. You've got some time, you'll have some time on rebuttal, Mr. Anders. Thank you. There's one last issue on well settled that I'd like to get you, but I can get it on rebuttal. No, why don't you get it now, because then we'll have a full argument. The fourth and final issue is the well settled defense, which the court found was applicable here. That defense was waived by the appellee before the trial even occurred. There was two rounds of briefing. It was never raised there. It's her burden to present the evidence. They presented no evidence of this at trial. There was no mention of it in the two rounds of post-trial briefing. We were prejudiced by that dropping of the issue. Substantively, there's a reason why. How did it come up and what was it supported by? It didn't come up at all until the judge issued his ruling, and then he just found that the well settled defense applied to the child in this case. Substantively, there's a reason why they dropped that defense. Well settled does not apply to children this young. The child was 3 years old at the time of trial. They're generally not deemed to be old enough and mature enough to make the kind of ties that fall under the well settled defense. Additionally, they're living in a homeless shelter. She has no employment. He's not in school. He ‑‑ Hungarian is his native language. It's her native language. None of the factors for the well settled defense apply here, and that was a clear error by the district court in finding some. Thank you. Thank you. And you've reserved ‑‑ excuse me. You've reserved two minutes for rebuttal, Mr. Andrews. Mr. Byland? Your Honors, may it please the Court, Jeremy Byland on behalf of the Apolline Ms. Ripa Herrera. Your Honors, this case is about whether a 5‑year‑old child who's lived almost his entire life in the United States, after being lawfully relocated here by his mother, must be returned to Hungary. Mr. Mohachi argues that a foreign court order that was finalized more than a year after that lawful relocation somehow turns that relocation into a wrongful removal or a wrongful retention under the hate convention. It does not. And the trial judge was justified in rejecting the petition on at least three independent legal grounds. I want to quickly highlight for the Court, before I talk about the law here, that the trial judge made credibility determinations after receiving live witness testimony, and he found that Mr. Mohachi was, quote, simply lying. And those same lies are now being peddled to this Court after being rejected by the trial court. My friend discussed several of those lies. One, that Ms. Herrera never told the Hungarian court or the police that she was coming to the United States. That's contrary to the district court's factual findings, which you will find on page 17. I was the one who asked the question about that. Yes, Your Honor. And what was the basis of the court's determination that that's what occurred? Her testimony? It is her testimony, and there's also Exhibit B-T, which I'm not aware of what that is, but it's primarily based on her testimony. I think that there's also, and maybe my friend can look up Exhibit B-T, that might be the Hungarian court transcript. Next, this issue about whether Isabella knew that Mohachi was the father, the trial court credited her testimony. Her testimony was that she did not know. And Mr. Mohachi actually threatened to kill her if it turned out not to be his child. Remember, she was forced into sexual liaisons in December 2013, which is exactly nine months before the child was born in September 2014. So there is, and was in her mind, a legitimate question as to whose child that was, whether it was his or whether it was Dave Valentine Smith's child. Remember that Smith is Mohachi's drug dealer, and basically Mohachi had Isabella sleep with his drug dealer. And I think the other thing I would point out, when these two met, Ms. Herrera was in her teens, and Mr. Mohachi was approaching 40. And just to give you a flavor of the sexual abuse that occurred. So out of these credibility determinations that the trial judge made, there's four important factual findings. One, that Ms. Herrera was the victim of prolonged and intense abuse of a psychological, sexual, and physical nature at the hands of Mr. Mohachi. And the reason that the record is so long in this case is because of how well documented that abuse is. Two, that because of that abuse, Ms. Herrera never intended to raise her child in Hungary. She always intended to raise him in the United States where her stepfather lives. Three, that if that child was returned to Hungary, he will be at a heightened risk of being harmed. And four, that the child is now at home in the United States and is settled here. Thank you. So back to the question of telling the court. So one of the bases of the trial court's decision that Ms. Herrera had told the court was Exhibit B-T, which is the Hungarian court transcript. So I'd point your attention to that. Again, Page. Let me ask you this. And I know we don't have to address this if the defense of grave risk of harm applies. Yes, Your Honor. But not on the wrongful removal, but on the wrongful retention argument. Yes, Your Honor. Depending on how the Supreme Court comes out, couldn't that alter? In other words, if the Supreme Court determines in the Taglier case that infants don't have a habitual residence, that you can't, you know, a four- or five-year-old not an infant, but a four- or five-year-old cannot establish habitual residence, wouldn't that potentially give them a grounds to argue that this was a wrongful retention? I don't think so, Your Honor, because of the Gitter v. Gitter case. So I think the issue at Taglieri is whether an infant, like, whether an infant is young enough to basically. You mean whether it's old enough? Well, sorry, whether an infant is old enough to, like, establish a new habitual residence. I just said, you know, that can't happen. Right. You would look at the intent of under Gitter. You would look at the intent of the parent or parents, right, who had control over where the child should live. And that only person who had those rights was Herrera. So if the infant can't decide, then you look at the intent of, and this isn't Gitter v. Gitter. It says person or persons, right? So the Gitter v. Gitter, this Court recognized it could be one person, and here it was one person. So I think what Gitter holds is that Isabella's intent as the only parent and the only custodian merged with the physical relocation to the United States, this is on page 132 and 133 of Gitter, that establishes his habitual residence in the United States based on parental intent, not based on the child. But if he's determined to be the parent from the paternity order, right, couldn't the test then be if there's no subjective agreement between the parents? He's not the parent. No. But we're talking about wrongful retention now. At the time of the retention, he is the parent, right? Right. But his habitual residence had been established in the United States well before the alleged retention. No, but the Supreme Court may say that's not established. The Supreme Court said he has the child has no habitual residence. They could establish a test that says in the absence of a habitual residence in the new country, then there would have to be a subjective agreement among both parents that he'd be allowed to stay there. And we don't have that in this case. He doesn't have any country of habitual residence, then he can't return to Hungary because Hungary is not his country of habitual residence. Well, I guess my point is that we don't know exactly how the Supreme Court, if they determine that a child of this age can't have a habitual residence, what the test is going to be absent that. I think the test is you look at the intent of the parent or parents, right, at the time of the relocation who had the authority to say where the child lived, if there's unified intent. So the case, Tagliare, in my understanding, is not about whether joint parents or the only custodial parent can decide where the child lives. It depends on if there's a diversion of the parent's interests. Couldn't there be a determination that he did not, he, with the paternity order, he is the parent and there's no habitual residence here under the, you know, the new test, I guess, and there was no agreement by him that the child should be brought to the United States. No subjective agreement on both parents that he should be brought to the United States and therefore he should return. Is that not a possibility? I don't think it's a possibility because then Hungary wouldn't be the country of habitual residence either because there was never any shared intent that Hungary would ever be. No, but it's where the child, where the parents were before the removal, though. Right. It would sort of be the default at that point, right? But I think if you look at Redmond and White, I think the point is that a springing custodial order, so Tagliare is a case where you have parents from the get-go, right? You have two parents from the get-go. The problem is we have a springing parental custodial right that happens after a lawful relocation. And I don't think that Tagliare would disturb White and Redmond. And in White and Redmond, that springing parental and custodial order can't make the relocation somehow wrongful and retroactively. But even if all that aside, because of the well or the two affirmative defenses that Isabella established, the child won't have to return anyway. And talking about the grave risk of harm, there was three bases for that determination by the trial judge. There was a predictive determination in which there was no clear error that Isabella was likely to be abused again if she was to return to Hungary. And that fits well within this Court's case law that that is sufficient for a grave risk of harm. There's also a second ground. We have unrebutted expert witness testimony establishing that it's likely that Mahatchi will abuse the child directly. And then the third ground, which we raise in our brief, is the trial court credited a direct threat, and this is in the appendix 959, that Mahatchi was going to show the child pornographic videos of his mother. And we have cited to you district court case law indicating that that's a grave risk of harm. And I don't think that there's any error, in any of those determinations. Is any one of them sufficient to get over the line? I think all three of them are independently. That's what I mean. Yeah. If you look at the first one, I don't think you have to go past the first one under Davies v. Davies. There's also, you know, a late-breaking course, Sata v. Golan, which was just decided by this Court this summer after we closed briefing, 930 F. 3rd 533. And in that case, you have a young child like we have here. There's a grave risk of harm. And in that case, the district court actually found that there was sufficient legal protections for that child in Italy, and this Court overruled that determination and sent it back, thinking that that analysis was not fulsome. And then, Turnington now settled. So, we have not, we did not waive this issue at trial. Ms. Herrera raised this in her answer. And while it is true we did not devote briefing to it before the trial court, the reason that it's not prejudicial to MHACHI is the fact that the analysis under the well-settled defense or now-settled defense is the same as whether the child is acclimatized in a new country. And you'll see in our briefs there's extensive briefing at trial as to whether the child was acclimatized. So, it's actually the same evidence. And so, it wasn't prejudicial to MHACHI for the court to reach that. Acclimatized comes in under what test? So, if you have shared parental intent and then you have a deviation from that and you have a wrongful removal, that child, if they go, they can, that child can still establish a new habitual residence in a new country if they become acclimatized to the new country. And so, we discussed that at length. Okay. And is there evidence reflecting on whether a 3-year-old, if I've got the age right? I believe it was 4 at the time of trial, but. But is capable of being acclimatized? Sorry, are you asking me if there's case law or are you asking me whether there's actual facts? No, no, in the record here. Yes, sir. So, again, these are factual findings made by the judge on which there was no clear error that the child lived continuously in New York. And this is at page 46 through 47 of the trial judge's opinion. But he basically enlisted about a dozen different things. His continuous residence in New York, the fact that he spent most of the time at one address, that he lived in a safe and secure location, that he was enrolled in kindergarten, that Ms. Herrera is supported by her father financially, that he has friends in New York, that his primary language is English and he speaks only a few words of Hungarian, that they are both lawful permanent residents of the United States, that he has medical insurance, and also expert testimony about how well adjusted he is. And also, if you look at the Lozano v. Alvarez case, which we cite in our briefs, it's a very similar factual situation. You have a young child whose contacts to the United States include primarily school, family, and medical care, in which the court found that the child was now settled in the United States. Your Honors, we'd ask that you dismiss this appeal because there was no error, let alone clear error in the district court's finding. Just a correction before I sit down, and I apologize for this, that exhibit BT was actually not the Hungarian trial transcript. It was actually Mahatchi's report to the police saying that she was going to the United States. So, again, exhibit BT referenced by the trial court is Mahatchi's police report, not the Hungarian trial exhibit. Okay. Thank you. Thank you, Your Honors. Thank you for that. Thank you, Mr. Byland. Mr. Andrus. Thank you. I think there's some confusion I'd like to clear up about habitual residence. So habitual residence, it's very rare for there to be a finding that a child has no habitual residence when they're born. And that is what the court found below here, that when he was born in Hungary, lived there for a year, Hungarian parents, they'd always lived in Hungary, Hungarian citizens, the court still found that he had no habitual residence because there was confusion or intent or a cloud of confusion around where he's going to live in the future. But the court, in doing so, relied on a Third Circuit case, Delvoy, and that case involved medical tourism. The mother went to another country to have the child just to save money on birthing expenses. And in that case, the child didn't have a habitual residence in the country of birth because the country of birth was not the mother's habitual residence. But in almost every other case that's addressed this issue, they've distinguished Delvoy and found that the birth country grants a habitual residence to the child upon birth. I would point you to, for example, Nicholson, which is a First Circuit case, Holder v. Holder, which is a Ninth Circuit case, Ruiz v. Taddeo, Eleventh Circuit, and Taglieri, which you already brought up, Justice Bianco. The second thing I'd like to clear up is on the removal issue. It is true that this would be a unique case for removal in the United States. But as this Court has held, on a novel issue interpreting the convention, we should look to our sister signatory states for how they've interpreted the convention. And all four instances where this fact pattern has been presented, they have found a case for removal based on custody of the court adjudicating the paternity or custody dispute at issue. Custody or paternity? Here they are custody, but here they are the same. Paternity grants custody in — paternity grants custody automatically. I don't think there's a dispute about that issue. There's other cases that say we're not going to — someone moves to another country and then there's a custody determination, make it a hate violation, when your client could go into State court, right, and try to make some custody argument in New York State court, right? Isn't that open to him? That's true, but the purpose — go ahead. No, go ahead. The purpose of the convention is to determine what is the proper forum for that custody determination. And the proper forum is the place where the child was wrongfully removed from. There already is — there already was a proceeding going on about the custody of this child, and it was in Hungary, and she skipped out on those proceedings. I would also point out that the enacting statute for the convention contemplates that wrongful retention and wrongful removal should apply even before an order granting that custody has been enforced. Additionally, the Perez-Vera report, which is the authoritative commentary in history on the convention, specifically states that the remedies of the convention should apply to cases where they're removed before a custody determination can be made by a court. And with that, I would — Let me just ask you so you can help me find it in the record, Mr. Andrus. Is there expert testimony on Hungarian law that says prior to a determination that a determination of paternity is the functional equivalent of a determination of custody? Yes. Our expert testified that a grant of paternity automatically carries with it a custody right. It is also a — A custody right, but it's in coed at the time. A custody right that it is automatically — I can take you into State court, so bear with me on this. And we've got paternity, and there's a fight over custody. But you automatically have a convention right to determine that — But you're not in — The person cannot take the child out of the country without your permission under the convention. At the time there's somebody coming in and claiming paternity in Hungary, that person automatically is fighting custody. That's what you want us to say. Automatically, it is part of custody. Their expert testified under Hungarian law that Dr. Illes said paternity cases are not about custody, not about child support, not about visitation, that those issues are decided in a separate proceeding brought by a parent after parental rights have been established. She's referring to custody in the sense of, like, 50 percent, 50 percent, weekends, holidays, that type of custody division, physical custody of the child. That's what she's referring to. She's not referring to the right of a parent to decide where the child lives. That is the right under the convention that matters, and that right is automatically conferred by parenthood. I would refer you to — By parentage. By parentage. Which was incomplete at the time. That right was not being determined. Parentage was being determined by the Hungarian court. It was a paternity lawsuit. It was a question of who was the father of this child, because that was left blank. Okay. Thank you. Thank you both. We'll reserve decision in this case.